UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Global Crossing Ltd., *et al.*, | ) | Case No. 02-40188 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| The Global Crossing Estate Representative, | ) | Adversary No. 04-01731 (REG) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Alta Partners Holdings LDC, and approximately 134 other defendants, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| The Global Crossing Estate Representative, | ) | Adversary No. 05-02234 (REG) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Credit Suisse First Boston LLC, and seven other defendants, | ) | |
| Defendants. | ) | |
| _____ | ) | |

DECISION AND ORDER ON MOTIONS (1) TO
DISMISS UNDER STATUTE OF LIMITATIONS
AND (2) TO EXTEND TIME FOR SERVICE OF
PROCESS ON NEWLY ADDED DEFENDANTS

-1-

APPEARANCES:

LORD BISSELL & BROOK, LLP
Counsel for Global Crossing Estate Representative
111 South Wacker Drive
Chicago, IL  60606
        By:    Forrest Lammiman, Esq.
               Patrick Jones, Esq.

BROWN RUDNICK BERLACK & ISRAELS
Counsel for Global Crossing Estate Representative
Seven Times Square
New York, NY  10036
        By:    Lisa M. Kelsey, Esq.

WILMER CUTLER PICKERING HALE & DORR, LLP
Counsel for the WilmerHale Defendants
399 Park Avenue
New York, NY  10022
        By:    Philip D. Anker, Esq.

ANDREWS KURTH LLP
Counsel for the Andrews Defendants
450 Lexington Avenue, 15th Floor
New York, NY 10017
        By:    Paul N. Silverstein, Esq.
               Lynne M. Fischman Uniman, Esq.

DILWORTH PAXSON LLP
Counsel for the Dow Defendants
LibertyView, Suite 700
457 Haddonfield Road
P.O. Box 2570
Cherry Hill, NJ 08034
        By:    Anne Marie P. Kelley, Esq.
               Scott J. Freedman, Esq.
               Holly R. Rogers, Esq.

MAYER, BROWN, ROSE & MAW, LLP
Counsel for Defendant CIBC
71 South Wacker Drive
Chicago, IL  60606
        By:    Vincent R. Schmeltz, Esq.

MORGAN, LEWIS & BOCKIUS, LLP
Counsel for Defendant Jefferies & Co., Inc.
101 Park Avenue
New York, NY  10178
      By:   Jay Teitelbaum, Esq.

CERTILMAN, BALIN, ADLER & HYMAN, LLP
Counsel for Defendant Anglo-American Security Fund, L.P. and Drake Associates, L.P.
90 Merrick Avenue
East Meadow, NY 11554
      By:   Jaspreet Mayall, Esq.

LAZARE, POTTER, GIACOVAS & KRANJAC LLP
Counsel for Defendants Dreyfus A Bonds Plus, Dreyfus Core Bond Fund and Dreyfus
Intermediate Term Income Fund
950 Third Ave.
New York, NY 10022
      By:   Michael Conway, Esq.


BEFORE:    ROBERT E. GERBER
           UNITED STATES BANKRUPTCY JUDGE


     In these adversary proceedings under the umbrella of the jointly administered confirmed chapter 11 cases of Global Crossing Ltd. and 54 of its subsidiaries, plaintiff Global Crossing Estate Representative seeks to recover, as constructively fraudulent transfers, dividend payments aggregating approximately $20 million, paid just a few weeks before Global Crossing's chapter 11 filing, that found their way into the hands of the approximately 143 defendants (the "Dividend Recipients") in these actions.

     But when the underlying adversary proceedings were commenced (five days before the statute of limitations for avoidance actions would run), the Estate Representative sued only a single defendant, EquiServe, Inc. ("EquiServe")—the entity to whom Global Crossing had made a single payment for the aggregate $20 million sought to be recovered.  EquiServe—which was *Global Crossing's* agent for paying the dividends, and neither a Dividend Recipient nor an agent of any of them—was just a

conduit. It was the first of a series of transferees of the dividend payments, which

ultimately reached the 143 Dividend Recipients, who received various portions of the

initial payment.

The Estate Representative thereafter amended its complaint to name the ultimate

recipients—but did so a year and half after the statute of limitations for asserting such

claims ran. The Dividend Recipients—contending that the amended complaint does not

"relate back" for statute of limitations purposes under Fed.R.Civ.P. 15(c)—move to

dismiss under the statute of limitations, arguing principally[1] that suing EquiServe, instead

of the ultimate recipients, was not a "mistake" within the meaning of Rule 15(c)(3).

---

[1]    One defendant, CIBC World Markets Corp., asserts that it too was a mere conduit. If factually
supported, such a defense might well have merit, but it is better addressed on summary judgment.

Another defendant, Dreyfus, claims that its receipt of a dividend was a "settlement payment"
immune from avoidance under section 546(e) of the Code, and that Dreyfus is thus absolved from
the liability that recipients of dividends normally have when dividends are paid by insolvent
debtors. Like the court in *Weinman v. Fidelity Capital Appreciation Fund (In re Integra Realty
Res., Inc.)*, 198 B.R. 352 (Bankr. D. Colo. 1996), *aff'd*, 354 F.3d 1246 (10th Cir. 2004) ("*Integra
Realty Resources*"), the Court rejects this contention. In the context of a transaction that is argued
to be within section 546(e)'s securities contract safe harbor provisions, "settlement payment" is
defined, unhelpfully, in section 741(8) of the Code—aptly described to be "as opaque as it is
circular," *see Brandt v. Hicks, Muse & Co. (In re Healthco Int'l, Inc.)*, 195 B.R. 971 (Bankr. D.
Mass. 1996) (Queenan, J.)—as "a preliminary settlement payment, a partial settlement payment,
an interim settlement payment, a settlement payment on account, a final settlement payment, or
any other similar payment commonly used in the securities trade." More usefully, in this district a
"settlement payment" has been judicially recognized to be a "transfer of cash or securities made to
complete a securities transaction." *Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*, 325
B.R. 671, 684 (Bankr. S.D.N.Y. 2005) (Gonzalez, J.). As applicable to this case, which was filed
before amendments were made to these provisions of the Code, "[s]ecurities contract" was defined
(in section 741(7), in relevant part) as a "contract for the purchase, sale or loan of a security." And
while later amendments to the Code—inapplicable to this transaction but instructive as to what
Congress was thinking about—broadened that definition and section 546(e)'s safe harbor, they
conspicuously failed to provide in either place for an exemption for the payment of dividends.
The issuance of a dividend on stock previously purchased is not a payment for the purchase, sale
or loan of securities.

The purpose of the section 546(e) safe harbor, as Dreyfus notes in its brief, is to "prevent 'the
insolvency of one commodity or security firm from spreading to other firms and possibly threaten
the collapse of the affected market.'" *See also Integra Realty Resources*, 198 B.R. at 356 ("The
legislative intent behind section 546(e) is … 'to minimize the displacement caused in the
commodities and securities markets in the event of a major bankruptcy affecting those
industries.'") (quoting Congressional record). But that merely underscores the inapplicability of
section 546(e) here. Recovery of an improper dividend from the ultimate recipient—as contrasted
to a clearing agent or broker that might have been a conduit or counterparty to dealings with others

In related requests for relief, the Estate Representative asks this Court to enter orders extending the Estate Representative's time to serve unnamed and unidentified defendants (such as the Dividend Recipients) beyond the time the Estate Representative originally had to serve the original defendant EquiServe—and the Dividend Recipients ask this Court to vacate (or at least regard as ineffective for statute of limitations purposes) earlier orders that the Estate Representative sought and obtained extending the time for service before the Dividend Recipients had a chance to appear and be heard in this action.

The motions before the Court present issues of considerable importance in chapter 11 cases—especially in light of the not-uncommon practice, familiar to those in the bankruptcy community, of estate representatives bringing avoidance actions just before the statute of limitations runs, and then erroneously naming the initial payee, which turns out to have been a mere conduit, with the ultimate recipient(s) being discovered thereafter.[2]  Relying on authority in non-bankruptcy cases (including, especially, *Barrow*

---

in the securities industry—raises no risks to the stability of the securities markets.  While the Court is sensitive to the importance of protecting the securities trading markets and counterparties to securities trading transactions, protection of neither interest requires an immunity for recipients of dividends on the stock of insolvent debtors.  *See Integra Realty Resources*, 198 B.R. at 360 (noting that if Congress had intended to treat a stock dividend as a settlement payment, "it could have stated that a trustee could not avoid any securities transfer or transaction including dividends made to or by a financial institution or clearing house whether or not an exchange of money and securities is involved as in a settlement payment").

[2]      *See, e.g.*, *Official Comm. of Unsecured Creditors v. Reliance Ins. Co. (In re Color Tile Inc.)*, 278 B.R. 366, 373-374 (D. Del. 2002) ("*Color Tile-District*") (where Creditors' Committee, in avoidance action seeking to recover preferred stock dividends, initially timely sued only a conduit, Creditors' Committee's lack of knowledge of the identities of subsequently named dividend recipients did not preclude relation back under Rule 15(c)(3), but Creditors' Committee failed to show that the recipients had the requisite notice, 92 Fed. Appx. 846, 2004 WL 287149 (3d Cir. Feb. 11, 2004) (Not Precedential) ("*Color Tile-Circuit*") (finding issues of fact as to notice to subsequently named dividend recipients); *Randall's Island Family Golf Ctrs. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs.)*, 2002 WL 31496229 (Bankr. S.D.N.Y. Nov. 8, 2002) (Bernstein, C.J.) ("*Randall's Island*") (granting motion to amend complaint to add additional defendant in avoidance action conduit case, rejecting argument that amendment would be futile in light of statute of limitations); *Alberts v. Arthur J. Gallagher & Co. (In re Greater Southeast Cmty. Hosp. Corp. I)*, 341 B.R. 91 (Bankr. D.D.C. 2006) (Teel, J.), *clarified on motion*

*v. Wethersfield Police Department*,[3] a decision of the Second Circuit), involving different kinds of asserted mistakes, the Dividend Recipients argue that the Court is bound by broad language in those cases that states, in substance, that there can be no mistake where the plaintiff initially does not know the identity of the party that should have been sued.

The Court cannot agree. Textual analysis—along with Supreme Court authority repeatedly underscoring the importance of reading statutes and rules as they are written—requires that Rule 15(c)(3) be construed in a manner that finds there to be a mistake in any case where there is, in fact, a mistake. In *Barrow*, there was no mistake, and the *Barrow* decision was amended to make that unmistakably clear. Here there was one. Decisions in other conduit cases, dealing with identical or much more closely similar facts—and the same or similar mistakes—provide the appropriate basis for this decision. For those reasons, and those in the discussion below, the Court holds that the "mistake" element of Rule 15(c)(3) was satisfied here, where by mistake an estate representative initially sued the conduit, instead of the ultimate recipient.

With that said, the Court rejects, at least on the facts here, the argument implicitly made by the Estate Representative that a general purpose Rule 4(m) extension for service of process could be used not just to serve, but also to seek out and identify, defendants who had not yet been named or identified. In this case, the first request for a Rule 4(m)

---

for reconsideration, 2006 WL 2083500 (Bankr. D.D.C. June 26, 2006) ("*Greater Southeast*") (same); *Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*, 361 B.R. 36 (Bankr. S.D.N.Y. 2006) (Gonzalez, J.) ("*Enron-Merrill Lynch*") (in avoidance action conduit case, debtor's lack of knowledge of the entity that received funds originally transferred to the conduit could constitute "mistake" of the type required under Rule 15(c)); *Enron Corp. v. J.P. Morgan Sec., Inc. (In re Enron Corp.)*, 357 B.R. 257 (Bankr. S.D.N.Y. 2006) (Gonzalez, J.) ("*Enron-Earthlink*") (same).

[3]    66 F.3d 466 (2d Cir. 1995) (the "*Initial Barrow Decision*"), *modified*, 74 F.3d 1366 (2d Cir. 1996) (the "*Barrow Modification Order*," and as modified, "*Barrow*"). *Barrow* appears in the bound volume of 66 F.3d in its pre-modification form. The Westlaw and Lexis versions that appear when 66 F.3d 466 is electronically searched show the decision as modified. The differences between the original and revised versions of the *Barrow* decision are most easily seen by review of the table showing those differences that appears in Appendix A to this decision.

order did not seek an extension for that purpose, and the Court did not understand its order to be entered for that purpose. The Knowledge of Mistake Requirement is only one of several requirements imposed by Rule 15(c). And another—far more important to fairness to prospective defendants—is that such defendants *timely* receive adequate notice of the claims against them, and that they not be prejudiced in their defense on the merits.[4] Here, in light of the language of the order the Court entered on the first Rule 4(m) request, and the stated reasons for securing that order, the Court is not in a position to find that the first Rule 4(m) order extended the time to provide notice to the then-unnamed and unidentified Dividend Recipients beyond the 120 days after the filing of the complaint that named EquiServe.

Under the facts here,[5] there is no basis in law or fairness, in this Court's view, for extending a statute of limitations protecting unnamed and unknown defendants by a year and a half—or, for that matter, beyond the 120-day period that permitted the initial defendant EquiServe to be sued—even in cases of mistake. The Court must be wary of making the statute of limitations a nullity.

Thus the Dividend Recipients' motions to dismiss are denied, without prejudice to renewal upon summary judgment. And the Estate Representative's previously undecided motions to extend the time to serve are denied, and those that were previously granted are now held to be ineffectual to support relation back. After the parties are in a position to provide the Court with a factual record as to the extent to which any Dividend Recipients

---

[4]    *See* 3 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 15.19[3][e], at 15-116 (3d ed. 2007), quoted in full at n.36, *infra*.

[5]    If the Court were faced with the facts addressed in *Greater Southeast*, or *Byrd v. Abate*, 964 F. Supp. 140, 146 (S.D.N.Y. 1997) (Sweet, J.), discussed below, it would likely rule similarly, but finds those cases distinguishable. *See* Part III below.

knew or should have known, within 120 days of the filing of this action, that they would

have been named as defendants on these claims, any party may move for summary

judgment if it so desires.

Facts

*A. Appointment of Estate Representative*

On January 28, 2002, Global Crossing Ltd. and 54 of its debtor subsidiaries

(together, the "Debtors") filed voluntary chapter 11 petitions in this Court.  On

September 16, 2002, the Debtors filed their Joint Plan of Reorganization (the "Plan"),

which was confirmed on December 26, 2002 and became effective just under a year later,

on December 9, 2003.

Under the Plan, a liquidating trust was established to liquidate the Debtors' assets,

and the Estate Representative was appointed to prosecute causes of action for the benefit

of the Debtors' creditors, including avoidance and recovery actions under section 550 of

the Code.  Over a six-day period between January 22, 2004 and January 27, 2004—just

before the two-year statute of limitations for bringing avoidance actions would run—the

Estate Representative filed approximately 1,000 adversary complaints to recover

preferential and/or fraudulent transfers totaling approximately $340 million.

*B. The Adversary Proceedings Here*

One of those complaints, filed on January 23, 2004, initiated the two adversary

proceedings now before the Court.[6]  The complaint named a single defendant, EquiServe,

and sought recovery of four preferential transfers, one of which was a transfer of

---

[6]    In April of 2005, claims now asserted in the second adversary proceeding were severed from the
first, and prosecuted by different counsel, to address counsel conflicts issues.  The legal issues
presented in each adversary proceeding are the same.  In the remainder of this decision, for
simplicity, the two adversary proceedings will generally be referred to as if they had remained a
single action.

$20,045,048 (the "$20 Million"), the only transfer at issue here.  The transfer had been made on November 1, 2001, 84 days before Global Crossing's chapter 11 filing.

### C.  Service Upon EquiServe

On April 23, 2004, the Estate Representative served the original complaint on EquiServe.  On May 26, 2004, EquiServe informed the Estate Representative that the transfer of the $20 Million was not for EquiServe's benefit.  EquiServe advised that it was the Debtors' own transfer agent with respect to stock distributions, and that it was merely a conduit; EquiServe had forwarded the entire $20 Million to the Depository Trust Company ("DTC") for dividend payments to holders of preferred stock.

### D.  Amendment of the Complaint

Thereafter, the Estate Representative determined to amend its legal claims with respect to the $20 Million to assert the constructive fraudulent conveyance claims that are typical in those instances when insolvent companies pay dividends.  Though only with the assistance of discovery compliance rulings this Court was required to issue, the Estate Representative eventually identified the Dividend Recipients as the actual, or beneficial, recipients.  With the benefit of discovery, the Estate Representative learned that DTC, in turn, had forwarded respective shares of the $20 Million to the Dividend Recipients, and/or to various brokerage houses or banking institutions on the Dividend Recipients' behalf.

On June 6, 2005 (after seeking and obtaining extensions of its time to serve process discussed below), the Estate Representative filed an amended complaint to name the Dividend Recipients, in lieu of EquiServe.  But by this time, the statute of limitations for suing them had run, by about a year and a half—unless, under Rule 15(c)(3), the

amended complaint naming them would relate back to its timely commenced predecessor.

*E. Orders Extending the Time to Serve Process*

On May 4, 2004, the Estate Representative filed a motion, principally under Fed.R.Civ.P. 4(m) and Fed.R.Bankr.P. 7004(a) and 9006(b), for an order extending its time for service of process with respect to the approximately 1,000 adversary complaints that the Estate Representative had filed, including the action that is the subject of the controversy here.  But the Court notes, and emphasizes, that the particular needs and concerns of this action were not addressed in any way, and that this action was covered under the motion only as one of the approximately 1,000 actions covered by generic language applicable to all.  As importantly or more so, a Rule 4(m) extension was not necessary to serve EquiServe—at the time the only defendant in this action—because EquiServe *already* had been served, and timely served,[7] back on April 23.

The Estate Representative's motion, which was returnable (on presentment)[8] on May 17, 2004, and on notice to the principal stakeholder entities in the Global Crossing cases and a number of prospective defendants (but none of the Dividend Recipients, whose identities, both sides agree, were not then known), sought an additional 120 days to serve process in the 1,000 cases covered under the motion.  As noted, the motion made no reference to any facts unique to the adversary proceedings here.

---

[7]     The Estate Representative had 120 days to serve any defendants initially named without the need for extensions from the Court.  *See* FED. R. CIV. P. 4(m).  That time would not expire until May 23, 2004, about a month after EquiServe was served.

[8]     "Presentment," as that expression is used in the bankruptcy courts, is a practice where, after notice, a motion may be granted without a hearing in the absence of objections.  It is frequently used in cases where the relief sought is perceived by the movant as uncontroversial, and where it is hoped that the costs of a hearing can be avoided.

The motion asserted that the Estate Representative had succeeded in serving approximately 455 defendants, but had about 460 summonses yet to be issued and/or served.  The motion declared that the 120-day deadline for service imposed by Fed.R.Civ.P. 4(m) would expire on May 21, 2004 for the earliest filed adversary proceedings, and May 27, 2004 for the last filed of them.  It then set forth the reasons why the extension was sought:  the task of amassing the addresses of approximately 1,000 defendants; missing addresses; information difficulties occasioned by the earlier sale of Global Crossing to third-party buyers; books and records that could not be found; burdens on the Clerk of the Bankruptcy Court in this district (dealing with nearly 5,000 other adversary proceedings in *Enron*, *Ames Department Stores* and *Bethlehem Steel*); delay of returned mail; and the judicial economies that would result in avoiding the need to require 1,000 separate motions for extensions of time.   The stated needs—which were variants of the problems plaintiffs not uncommonly face in serving defendants already named—did *not include*, however, a need to identify additional defendants who had not previously been named, who might thereafter be sued.

Upon this showing, and without significant opposition,[9] the Court concluded that the Estate Representative had made a satisfactory showing of cause for extensions of time to serve process, and the motion was granted on May 18, 2004.  The Court stated in the recitals preceding the decretal paragraphs of the resulting order, which was drafted and submitted by the Estate Representative, that "the Motion is necessary and in the best

---

[9]    Only one entity (not a Dividend Recipient) objected.

interests of the Global Crossing Estate Representative, the defendants to the Adversary

Proceedings[10] and the Debtors' estates."

The order provided, in relevant part, that it was ordered:

> that the 120 day service period set forth in … Rule 7004(m) of the Bankruptcy Rules (the "Service Period") shall be extended 120 days, to and including September 24, with respect to adversary proceedings commenced by the Global Crossing Estate Representative prior to the date hereof (the "Adversary Proceedings") …

> ORDERED that any party to an Adversary Proceeding, may, for good cause shown and where circumstances warrant, seek a modification of the terms contained in the prior decretal paragraph with respect to that particular Adversary Proceeding; …

> ORDERED that counsel for the Global Crossing Estate Representative shall serve a copy of this Order upon any defendant in a particular Adversary Proceeding specifically affected by this Order either with the summons and complaint or as soon after service of the summons and complaint as possible; and …

> ORDERED that service of the Motion upon … (v) any defendant in the Adversary Proceedings specifically affected by the Motion for which the Global Crossing Estate Representative has identified a reliable and accurate address for purposes of service is hereby deemed good and sufficient service of the Motion….[11]

---

[10]     The propriety of the inclusion of this element of the recitals is at best debatable.  The Court is confident that when signing this essentially uncontested order, it did not focus at the time on whether extending the time to sue defendants was really in *their* interests; the order was entered to meet needs and concerns that a *plaintiff*, like the Estate Representative, would have, as to which the Federal Rules authorize relief.  That is not, strictly speaking, relevant to the disposition of the motions here, except for one thing:  it spoke of the "defendants to the Adversary Proceedings"— *i.e.*, the defendants at the time—and is at least consistent with, if it does not also bolster, an interpretation of the order that it was intended to cover the defendants who were already defendants in those cases, and not others who might later be identified as prospective defendants, and/or thereafter be sued.

[11]     Order dated May 18, 2004 (ECF # 4302 in Case No. 02-40188) at 1-2.

As noted, the motion was heard and granted without notice to the Dividend
Recipients who are now the defendants in this adversary proceeding.  In fact, as of each
of May 4, 2004 (when the extension motion was filed), and May 18, 2004 (when it was
granted), EquiServe had already been served, and the other defendants in this case had
not been identified.  Nor had EquiServe yet notified the Estate Representative that it was
just a conduit and not the ultimate recipient of the dividend payments.  Nor had even the
*existence* of any other prospective defendants in these actions (much less their actual
identities) yet been established.

Thereafter, the Estate Representative sought and obtained many additional
extensions for service of process, including three before it sought to amend its complaint
to name the Dividend Recipients.  The Estate Representative added language to its
motion for its second extension request, representing that EquiServe had informed the
Estate Representative that EquiServe had forwarded the $20 Million to DTC; that the
Estate Representative had contacted DTC to request information; that the Estate
Representative intended to contact the various banks and brokerage houses that received
the dividend payments; and that the Estate Representative would serve subpoenas on
those banks and brokerage houses to determine the identity of the ultimate beneficial
recipients.  In addition, the Estate Representative reported that it had discovered the
parties who underwrote the preferred stock upon which the dividends were paid.  The
Estate Representative served its second extension request on EquiServe, DTC and the
underwriter entities (none of whom had received notice of the first request).  The Court
granted the second extension.

The second order, also drafted and submitted by the Estate Representative, had some differences from the first. It made specific reference to the motion's request for an extension of "the time for service of process in the EquiServe Adversary Proceeding"; recited that it was necessary and in the best interests of "the defendants to the EquiServe Adversary proceeding" (even though at the time, there was only one such defendant (EquiServe), which, as previously noted, had already been served); and provided, in relevant part:

> ORDERED that the 120-day service period set forth in Fed.R.Civ.P. 7004(m) … (the "Service Period") shall be extended an additional 120 days, to and including January 24, 2005, with respect to the EquiServe Adversary Proceeding …
>
> ORDERED that any party to the EquiServe Adversary Proceeding, may, for good cause shown and where circumstances warrant, seek a modification of the terms contained in the prior decretal paragraph with respect to the EquiServe Adversary Proceeding; …
>
> ORDERED that counsel for the Global Crossing Estate Representative shall serve a copy of this Order upon any defendant in the EquiServe Adversary Proceeding specifically affected by this Order either with the summons and complaint or as soon after service of the summons and complaint as possible; and …
>
> ORDERED that service of the Motion upon … (v) EquiServe; (vi) The Depository Trust Company and (vii) the Underwriters … is hereby deemed good and sufficient service of the Motion….[12]

The Estate Representative's third and fourth requests for extensions were the same in form and substance as the second request, were served on the same parties, and were similarly granted by the Court. With one exception (and except for the dates

---

[12] Order dated September 13, 2004 (ECF # 7 in Adv. No. 04-01731) at 2-3.

covered), the order entered on the third request did not differ in material respects from the

second order, quoted in material part above.  But with a slight variation, the third order

provided that it was in the best interests of "the defendant to the Dividend Adversary"—

which at the time was EquiServe.  The fourth order was in substance the same as the

third, except for the dates covered and except for the fact that it also covered the second

of the two adversary proceedings that the Court has referred to as "this action," which

was referred to as the "Severed Case."

On September 14, 2005, more than four months after the Estate Representative

None of the first four requests for extensions were served on any of the Dividend

Recipients.  After the Dividend Recipients were identified (which appears to have come

between the time of entry of the fourth order and the request for the fifth), the Estate

Representative provided notice to them of its desire to name them as defendants, and they

began to appear in these actions.  Very nearly immediately, they began to articulate their

statute of limitations concerns.

On September 14, 2005, more than four months after the Estate Representative

filed the amended complaint, the Estate Representative served its fifth request for an

extension on the parties who had received notice of the first four requests, and, for the

first time, on the Dividend Recipients. After considering the Dividend Recipients'

objections at a hearing on October 19, 2005, the Court granted the fifth request, but

provided for specific reservations of rights, including as to the extent, if any, to which

any of the Rule 4(m) orders would provide a basis for relation back.

The fifth order, entered on November 9, 2005, differed from its predecessors in

that it no longer provided, in any way, that it was in the interests of anyone other than the

Estate Representative and the Debtors' estates.  More importantly, it made reference to

"the reasons set forth on the record" at the October 19 hearing, and provided that it was
"subject to the rulings and limitations set forth by the Court at such hearing."

*F.  Efforts to Ascertain the True Dividend Recipients*

After EquiServe advised the Estate Representative of its conduit status, the Estate
Representative took steps to "follow the money," being led first to DTC, then to various
banks and brokerage houses, and, then, eventually, to remaining Dividend Recipients.
Based on its personal participation in the resolution of discovery disputes, the Court takes
judicial notice of the fact that the Estate Representative received considerably less than
full cooperation from intermediate payees in its efforts to uncover the ultimate beneficial
recipients—including failures to respond to the Estate Representative's discovery
requests that might variously be characterized as "sluggishness," at best, or
"stonewalling," as this Court used the term in a discovery dispute conference call.  But all
of that sluggishness and/or stonewalling came *after* EquiServe had already been named,
and after the statute of limitations—in the absence of relation back *and* an effective
extension with the first extension request—had already run.

## Discussion

Here, without dispute, the statute of limitations for the Estate Representative's
avoidance claims ran two years after the filing date for Global Crossing's chapter 11
cases, *i.e.*, two years after January 28, 2002.  Also without dispute, only EquiServe had
been named as a defendant in the original, timely-filed, complaint, and the Estate
Representative's complaint was amended to name the Dividend Recipients only after the
statute of limitations expired.  Thus the Estate Representative's claims against the
Dividend Recipients are time-barred unless they "relate back" to the timely-filed original
complaint.

-16-

## I.

## "Relation Back" Under Fed.R.Civ.P. 15(c)

"Relation back" of claims asserted after the expiration of a statute of limitations is governed by Fed.R.Civ.P. 15(c), made applicable in bankruptcy adversary proceedings by Fed.R.Bankr.P. 7015. Rule 15(c), as applicable when the Dividend Recipients' dismissal motions were filed,[13] states in relevant part:

> (c)  Relation Back of Amendments.  An amendment of a pleading relates back to the date of the original pleading when…

>> (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

>> (3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.[14]

Thus, Rule 15(c) sets forth two distinct standards for determining whether a claim should relate back, depending on whether new defendants would be added to the

---

[13]     Rule 15 was amended, along with many other Federal Rules of Civil Procedure, effective December 1, 2007.  The changes, which were made as part of the general restyling of those rules to make them more easily understood and to make style and terminology consistent throughout the rules, were intended to be stylistic only.

[14]     FED. R. CIV. P. 15(c).

litigation by operation of the rule.[15]  For old defendants and new, Rule 15(c)(2) imposes a requirement (the "Same Transaction Requirement") that any new claims arise out of the "conduct, transaction, or occurrence" set forth in the original pleading—a requirement that, despite contentions by the Dividend Recipients to the contrary, the Court finds to be easily satisfied here.[16]  But for newly added defendants, such as the Dividend Recipients here, there are additional requirements that must be satisfied, which present the more serious issues to be addressed in these cases. Those requirements are that:

(1) the new defendant received adequate notice of the plaintiff's claims within the time limits specified in Fed.R.Civ.P. 4(m), and will not be prejudiced in its defense on the merits—a requirement referred to below as the "Timely Notice/Lack of Prejudice Requirement";[17] and that

(2) the new defendant knew or should have known that but for a mistake concerning the identity of the proper party, the plaintiff would have named the new defendant in the earlier, timely, pleading[18]—a requirement referred to below as the "Knowledge of Mistake Requirement."

---

[15]    *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2005 WL 1278544, at *15 (S.D.N.Y. May 31, 2005) (McKenna, J.).

[16]    The old and new claims were both avoidance actions—involving claims under section 550 to recover the $20 million paid just before the Debtors' bankruptcy filing, at a time when Global Crossing was allegedly insolvent.  *See* Complaint dated January 24, 2004 and Amended Complaint dated June 6, 2005 (ECF #'s 1 and 31 in Adv. No. 04-01731).  The fact that the legal theories and factual showings would differ in some respects would not make this any less the same "transaction or occurrence."

[17]    *See* Rule 15(c)(3)(A).  The Dividend Recipients use their own shorthand expressions to describe Rule 15(c)'s requirements (*see* Div. Recipients' Br., dated September 30, 2005, at 14)—shorthand this Court rejects, as inconsistent with Rule 15(c)'s plain language and the thrust of the Rule as drafted.

[18]    *See* Rule 15(c)(3)(B); *Randall's Island*, 2002 WL 31496229, at *2 (citing *Hutnik v. Sec. Messenger Serv., Inc.*, 1999 WL 619592, at *4 (S.D.N.Y. Aug. 16, 1999) and *VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 128 (2d Cir. 2001)).

Each of the foregoing requirements breaks into two components or elements.  The Timely Notice/Lack of Prejudice Requirement requires (a) adequate notice within the time limits specified under Rule 4(m) (*i.e.*, within 120 days of the commencement of suit, unless extended), and (b) that the defendant not be prejudiced in its defense on the merits. The Knowledge of Mistake Requirement requires (a) that the new defendant knew or should have known that the claims in the earlier, timely, pleading would have been brought against it, and (b) that it knew or should have known that its failure so to have been named was the result of a "mistake concerning the identity of the proper party."[19]

Apart from their contentions that the Estate Representative has failed to satisfy the Same Transaction Requirement—contentions this Court has rejected—the Dividend Recipients contend that the Estate Representative has failed to satisfy each of Rule 15(c)'s Timely Notice/Lack of Prejudice and Knowledge of Mistake Requirements. Except for the legal determination as to the time by which notice must be measured, the first Requirement plainly raises factual issues, and the Court does not understand the Dividend Recipients to seriously contend that the Court can decide them on a motion to dismiss.[20]  The latter, however, raises threshold issues of law; the Dividend Recipients argue that because the Estate Representative, without dispute, did not know the identities

---

[19]    *See* 3 MOORE'S FEDERAL PRACTICE § 15.19[3][d], at 15-110.  "The rationale behind this requirement is that a legitimate legal claim should not be squelched by a party mistakenly identifying the party to be sued."  *Id.*

[20]    The chapter 11 filing by Global Crossing—whose petition showed assets of $22.4 billion, and liabilities of $12.4 billion, but which ultimately paid creditors only pennies on the dollar—was the financial equivalent of a plane crash.  Global Crossing's bankruptcy filing was widely reported, and at least possibly gained the attention of some or all of the Dividend Recipients, most of whom were sophisticated financial institutions.  With that said, knowledge of Global Crossing's bankruptcy would not necessarily equate to knowledge of the commencement of avoidance actions, and it is obvious that findings as to the extent, if any, to which Dividend Recipients knew or should have known that they would be sued for the return of their dividend payments cannot be made in this procedural setting and on this record.  Both sides will have the opportunity to prove or disprove compliance with the notice elements of Rule 15 in further proceedings down the road.

-19-

of the ultimate Dividend Recipients when it sued EquiServe instead, the Knowledge of

Mistake Requirement could not, under any circumstances, be satisfied.[21]  The Court turns

to those contentions now.

## II.

Knowledge of Mistake Requirement

As previously noted, the Knowledge of Mistake Requirement, appearing in Rule

15(c)(3)(B), requires that for an amended complaint to relate back to the original

complaint, a defendant whom a plaintiff seeks to add "knew or should have known that,

but for a mistake concerning the identity of the proper party," the action would have been

brought against that defendant.[22]  The parties differ sharply on what that means.  In

determining that, and applying it to the facts here, the Court considers Rule 15(c)'s text,

and caselaw relevant to how it should be construed.

*A.  Textual Analysis*

As usual, in accordance with directives of the Supreme Court and the Second

Circuit,[23] the Court starts with textual analysis.  The two elements of the Knowledge of

Mistake Requirement appear in different ways.  The first, the Knowledge Element—that

the newly added party (usually a defendant)[24] "knew or should have known that … the

action would have been brought against the party"—appears in a way that is in substance

---

[21]    The Dividend Recipients also argue, in connection with the Timely Notice/Lack of Prejudice
Requirement, that the extensions were not binding on them; that the Court should not have issued
any Rule 4(m) extensions after EquiServe was timely served; and that, even if the 4(m) extensions
were proper, they could not extend the statute of limitations for claims against the Dividend
Recipients under the facts presented here.  The Court agrees with several of those contentions.  *See*
Part III below.

[22]    FED. R. CIV. P. 15(c)(3)(B).

[23]    *See* n.37, *infra*.

[24]    For ease of understanding, as the newly added party will usually be a defendant, the Court will
refer to the newly added party as such.

free standing.  The second, the Mistake Element—"but for a mistake concerning the identity of the proper party"—appears in a subordinate clause.

The Knowledge Element is the dominant element of that sentence structure, and conveys the more fundamental idea—understandably so, as the underlying concept is *fairness*, to both the plaintiff and newly added defendant.  The Mistake Element, separated by commas in classic subordinate clause fashion, provides an additional requirement for the application of the Knowledge Element—that the newly added defendant knew or should have known that the action would have been brought against that defendant "but for [*i.e.*, "if not for"][25] a 'mistake.'"  Thus, while the more important element of the Knowledge of Mistake Requirement is the Knowledge Element—notice to the newly added defendant that it would have been sued—the Mistake Element must also be satisfied.[26]

"Mistake" is not defined in Rule 15(c), or elsewhere in the Federal Rules of Civil Procedure.  But at least in the respects material here, "mistake" is unambiguous.  As defined in two of the sources to which courts look most frequently, "mistake," in the context relevant here, is a "wrong action … proceeding from faulty judgment, inadequate knowledge, or inattention: an unintentional error,"[27] or "[s]ome unintentional act,

---

[25]    *See* GARNER, A DICTIONARY OF MODERN LEGAL USAGE 124 (2d ed. 1995).

[26]    But the sentence structure of Rule 15(c)(3) also makes clear that at least from a textual perspective, it is the *defendant's* knowledge that matters, not the plaintiff's.  As relevant here, Rule 15(c) requires that:

> *the party to be brought in by amendment* … (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

(emphasis added).

[27]    WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED 1446 (2002); *accord* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 760 (1983) ("a wrong action … proceeding from faulty judgment, inadequate knowledge, or inattention").

omission or error arising from ignorance, surprise, imposition or misplaced confidence."[28] Notably, under any of those definitions, a mistake can result or arise from, *inter alia*, "inadequate knowledge" or "ignorance." But in each case, it is still a mistake. Here, by reason of "faulty judgment, inadequate knowledge or inattention," and/or by reason of "ignorance," the Estate Representative sued the conduit and not the proper defendants. But in the absence of any indication that the Estate Representative did so as a matter of choice (tactical or otherwise), or *knowing* that it was suing a party that ultimately would not be the proper one, the Estate Representative's action was a classic mistake. The mistake here may have been an egregious one, but many mistakes are, and the Rule does not make distinctions based on the extent to which the error is understandable or excusable.[29]

Nor does mistake cease to be such when, assuming that it otherwise is mistake, it results from ignorance. As Garner notes in his discussion of "mistake" in his well known work:

> Every mistake involves ignorance but not vice versa. Ignorance is lack of true knowledge, either (1) because the mind is a complete blank or (2) because it is filled with untrue (mistaken)

---

[28] BLACK'S LAW DICTIONARY 1001 (6th ed. 1979).

[29] *Compare* FED. R. CIV. P. 60(b), made applicable in bankruptcy cases under FED. R. BANKR. P. 9024, and the caselaw in many areas of federal civil and bankruptcy procedural law (court may grant relief in cases of "*excusable*" neglect") (emphasis added). In the Rule 15(c) context, by contrast, as the First Circuit held in *Leonard v. Parry*, 219 F.3d 25, 29 (1st Cir. 2000) ("*Leonard*"):

> Virtually by definition, every mistake involves an element of negligence, carelessness, or fault—and the language of Rule 15(c)(3) does not distinguish among types of mistakes concerning identity. Properly construed, the rule encompasses both mistakes that were easily avoidable and those that were serendipitous.

` *See also Randall's Island*, 2002 WL 31496229, at *3 ("Rule 15(c)(3) is not restricted to good faith, honest mistakes, and encompasses mistakes resulting from negligence and carelessness").

> knowledge on a particular subject.  The first variety,
> lack of knowledge without mistaken knowledge,
> may be called simple ignorance.  *The second
> variety, lack of true knowledge coupled with
> mistaken knowledge, is mistake.*[30]

Thus, as a matter of the ordinary meaning of words, the mention of "mistake" in Rule

15(c) does not carve out from "mistake" those mistakes that result from ignorance.  Nor

is there any other language in Rule 15(c) that would impose such a carveout.

While the Second Circuit has not itself engaged in textual analysis of Rule

15(c)—having little occasion to do so, as in its two leading decisions in this area, the

plaintiff *knew* the previously named defendant was not the culpable one[31] or the

defendant had been sued as a matter of tactical choice[32]—the Third Circuit has.  In *Arthur

v. Maersk, Inc.*,[33] an admiralty tort action in which the plaintiff had erroneously sued the

ship owner, rather than the United States (which was liable for any injuries the ship

owner caused), the Third Circuit court engaged in textual analysis as part of its extensive

opinion.  It found it of "no consequence" that the plaintiff's mistake "resulted from lack

of knowledge, rather than mere misnomer."[34]  It went on to observe that:

> Although a majority of courts have held that only a
> "misnomer or misidentification" of an existing party
> can constitute a "mistake concerning the identity of
> the proper party" under Rule 15(c), … *there is no
> linguistic basis for this distinction.  A "mistake" is
> no less a "mistake" when it flows from lack of*

---

[30]    GARNER, A DICTIONARY OF MODERN LEGAL USAGE 568 (2d ed. 1995) (emphasis added).

[31]    *See Barrow*, 66 F.3d at 467 (as it appears in Westlaw and Lexis).

[32]    *See Cornwell v. Robinson*, 23 F.3d 694, 705 (2d Cir. 1994) (plaintiff knew the identities of those
who had harassed and discriminated against her and chose not to name them in the original
complaint); *see also Hedvat v. Rothschild*, 175 F.R.D. 183 (S.D.N.Y. 1997) (plaintiff's decision
not to pursue certain defendants was deliberate strategic choice and not result of any mistake as to
who was intended to be sued).

[33]    434 F.3d 196 (3d Cir. 2006) ("*Maersk*").

[34]    *Id.* at 208.

> knowledge as opposed to inaccurate description.
> Both errors render the plaintiff unable to identify
> the potentially liable party and unable to name that
> party in the original complaint…. Thus, both errors
> constitute a "mistake concerning the identity of the
> proper party" for purposes of Rule 15(c).[35]

*Moore's Federal Practice*, also cited by the *Maersk* court, shares that view.[36]

The Supreme Court has repeatedly directed the lower courts to construe statutes in

accordance with their plain meaning,[37] and has held likewise with respect to the Federal

---

[35]    *Id.* at 208 & n.15 (emphasis added) (*citing, inter alia, Pavelic & LeFlore v. Marvel Entm't Group*, 493 U.S. 120, 123 (1989) ("*Pavelic*") ("We give the Federal Rules of Civil Procedure their plain meaning…."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1446 (1981) (defining "mistake" as "a wrong ... statement proceeding from faulty judgment, inadequate knowledge, or inattention"); Advisory Committee Note to FED. R. CIV. P. 15 1966 (indicating that relation back is not limited to situations in which amendment simply "correct[s] a misnomer or misdescription of a defendant")).

The Court recognizes that the *Maersk* court mentioned *Barrow* as an example of holdings that "only a 'misnomer or misidentification' of an existing party" could constitute a "mistake concerning the identity of the proper party" under Rule 15(c). Though such a reading of *Barrow* is understandable in light of language appearing in that decision, this Court believes that such a reading of *Barrow* is in fact unwarranted, and that the language in *Barrow* must be considered in light of the context in which it was stated, and later changes in the *Barrow* opinion. Upon careful review, *Barrow's* holding, if not its dictum and/or words taken out of context, is fully consistent with textual and plain meaning analysis. *See* pages 27-33 & Appendix A, *infra*.

[36]    As stated in *Moore's Federal Practice*:

> The courts that take a broad view of the mistake requirement
> have the better-reasoned approach. A court should not limit
> its findings of mistake merely to cases of misnomer. Rather it
> should consider whether the new party knew that the failure to
> include it in the original complaint was an error rather than a
> deliberate strategy. While courts have focused on the mistake
> requirement in determining whether an amendment relates
> back, the more important considerations are (1) whether the
> new party received sufficient notice of the action to avoid
> prejudice, and (2) whether the new party knew or should have
> known that it was an intended party.

3 MOORE'S FEDERAL PRACTICE § 15.19[3][e], at 15-116.

[37]    *See, e.g., United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) (The task of resolving a dispute over the meaning of a statute "begins where all such inquiries must begin: with the language of the statute itself."); *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("The starting point in discerning congressional intent is the existing statutory text…. It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) ("The first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case…. The inquiry ceases if

Rules.[38]  As the Dividend Recipients themselves noted (albeit in a different context), the

Supreme Court "[has] stated time and again that courts must presume that a legislature

says in a statute what it means and means in a statute what it says there."[39]  Continuing,

the Supreme Court has stated that "[w]hen the words of a statute are unambiguous, then,

this first canon is also the last: 'judicial inquiry is complete.'"[40]  Pronouncements of the

Supreme Court tell this Court of the importance of plain meaning analysis to the Court's

analysis of what is, and is not, "mistake."  In *Ron Pair*, the Supreme Court told the lower

courts that the plain meaning of legislation should be conclusive, except in the "rare cases

[in which] the literal application of a statute will produce a result demonstrably at odds

with the intentions of its drafters."[41]  This action plainly is not such a rare case, especially

since it has been repeatedly and understandably held that the *purpose* of Rule 15(c) is to

provide litigants with their day in court, and not deprive them of their rights based on

technicalities, where they have provided timely notice to their opponents of their

claims.[42]

---

the statutory language is unambiguous and the statutory scheme is coherent and consistent.")
(citations omitted and internal quotation marks deleted in each case); *Mallard v. U.S. District
Court*, 490 U.S. 296, 300 (1989) ("Interpretation of a statute must begin with the statute's
language.").

[38]    *See Pavelic*, 493 U.S. at 123 ("We give the Federal Rules of Civil Procedure their plain
meaning….").

[39]    *Connecticut National Bank*, 503 U.S. at 254.

[40]    *Id.*

[41]    489 U.S. at 242.

[42]    *See Madarash v. Long Island R.R. Co.*, 654 F. Supp. 51, 55 (E.D.N.Y. 1987) (Denying a motion to
dismiss an amended complaint because "[s]uch a result might deprive plaintiffs of an opportunity
to have a determination in this Court of the merits of their claims because of technicalities of
pleading. That is surely not the intention of Rule 15(c)."); *Boan v. Damrill (In re Damrill)*,
232 B.R. 767, 772 (Bankr. W.D. Mo. 1999) ("Rule 15(c) was primarily intended to alleviate harsh
decisions which had defeated claims on technicalities that should have been decided on their
merits.").

Pronouncements of the Second Circuit hold likewise.  The Second Circuit has held that "Well-established principles of construction dictate that statutory analysis necessarily begins with the 'plain meaning' of a law's text, and absent ambiguity, will generally end there."[43]

Under any textual analysis, while the Estate Representative's suing the wrong party had its origin in ignorance (and though it is not legally relevant,[44] what some might regard as great carelessness, or even gross negligence), it was no less a mistake.  The Court's analysis must start, and typically must end, with applying statutes and rules in accordance with their plain meaning.[45]  If the Rules drafters (or Congress, which permitted the Rules to be enacted) wanted to limit the types of mistake that would pass muster under a Rule 15(c) analysis, they could have said so.  But they did not.

When the Estate Representative sued EquiServe, the wrong defendant, without actual knowledge that EquiServe was the wrong defendant or just a placeholder defendant, and without any tactical choice at that time as to whom the Estate Representative would sue or not sue, that was, by any fair definition of the term, a "mistake."  In accordance with the Supreme Court's rulings in the cases cited above, and again just a few weeks ago,[46] the Court construes Rule 15(c) in accordance with its plain language.

---

[43]    *Puello v. Bureau of Citizenship & Immigration Servs.*, 511 F.3d 324, 327 (2d Cir. 2007).

[44]    *See* n.29, *supra*.

[45]    *See Ron Pair*, 489 U.S. at 241 (With statutory analysis beginning "where all such inquiries begin … with the language of the statute itself … it is also where the inquiry should end, for where … the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'").

[46]    *See Ali v. Fed. Bureau of Prisons*, 128 S. Ct. 831, 837 (2008) (in context of statute providing that waiver of sovereign immunity does not apply to claims arising from the detention of property by "any officers of customs or excise or any other law enforcement officer," construing clause "any

Thus textual analysis compels a finding that the Mistake Element of the Knowledge of Mistake Requirement has been satisfied, unless binding or persuasive caselaw dictates a different result.

### B.  Relevant Caselaw

Caselaw in this area appears in the considerable number of conduit cases, in which courts in bankruptcy cases (from the bankruptcy court level to the Court of Appeals level) have analyzed Rule 15(c)(3)(B)'s requirements in instances where the conduit was the only defendant timely sued.  It also appears in plenary cases applying Rule 15(c)(3)(B) to controversies not involving either bankruptcy or suits against conduits—including decisions of the Second Circuit, one of which, the defendants argue, is binding on the Court.  As the Court has concluded that textual analysis requires a determination that the Mistake Element has been satisfied in a case, like this one, where there genuinely was a mistake, the Court then considers whether decisions of the Second Circuit, or persuasive decisions elsewhere, require rejection of the textual analysis result. The Court concludes that they do not.

### 1.  The Second Circuit Decisions

In support of their contention that the Mistake Element of the Knowledge of Mistake Requirement has not been satisfied, the Dividend Recipients rely principally on *Barrow*,[47] a case not involving a mistaken suit against a conduit—or as noted below, a mistake at all—but which has language, if taken out of context or extended beyond its context and the facts there presented, supporting the Dividend Recipients' position.

---

other law enforcement officer" literally to include *any* law enforcement officers, even those not enforcing customs and excise tax laws).

[47]     *See* n.3, *supra*.

*Barrow* involved a 28 U.S.C. § 1983 action by an inmate alleging that officers of the
Wethersfield Police Department used excessive force in effecting his arrest.  The plaintiff
(initially *pro se*, and eventually represented by appointed *pro bono* counsel) filed an
initial and three amended complaints struggling to bring suit against the right parties.  In
his initial complaint ("Complaint #1"), the inmate initially sued the City of Wethersfield
without naming individual officers at all, and the district court dismissed Complaint #1
without prejudice because a municipality could not be held liable under that statute solely
on the basis of *respondeat superior*.[48]

The inmate then amended his complaint (resulting in a "Complaint #2"), but only
by naming "Whethersfield [sic.] Police Officer's [sic.]"—*i.e.*, unnamed police officers.
Complaint #2 was of course also inadequate, but the district court gave the inmate still
another chance.  It instructed the inmate to add the individual police officers as
defendants, and specifically directed the inmate "to make every effort to obtain the names
of the police officers who participated in his arrest …."[49]

The inmate amended once again (with what became "Complaint #3"), but only by
naming ten "John Doe" defendants, representing those police officers.  Finally, with the
assistance of newly appointed *pro bono* counsel, the inmate eventually discovered the
names of the police officers participating in his arrest, and he amended his complaint
again (with what became "Complaint #4") to sue them by name, but only after the statute
of limitations for suing those police officers had run.[50]

---

[48]      *See Barrow*, 66 F.3d at 466-467 (as it appears in Westlaw and Lexis).

[49]      *Id.* at 467.

[50]      *Id.*

-28-

The district court dismissed the claims against the newly identified police officers under the statute of limitations, concluding that Complaint #4 did not relate back under Rule 15(c). The Circuit affirmed. In each of the Circuit's initial decision, and its decision after its modification order, the Circuit agreed that the Mistake Element of the Knowledge of Mistake Requirement had not been satisfied.

In language upon which the Dividend Recipients rely, the Circuit stated:

> Barrow's failure in his first three complaints to specify the defendants' names, and his listing of ten "John Does" in the complaint of July 1, 1991, were because he did not know the arresting officers' names. His amended complaint identifying six police officers by name—filed, by any calculation, after the statute of limitations had run—did not correct a mistake in the original complaint, but instead supplied information Barrow lacked at the outset. Since the new names were added not to correct a mistake but to correct a lack of knowledge, the requirements of Rule 15(c) for relation back are not met.[51]

Similarly, in somewhat broader language upon which the Dividend Recipients also rely, the Circuit preceded those observations with the comment, after discussion of a Seventh Circuit case[52] in which a plaintiff had likewise sought to amend a complaint against "unknown police officers":

> We are compelled to agree with our sister circuits that Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities.[53]

---

[51]   *Id.* at 470.

[52]   *See Worthington v. Wilson*, 8 F.3d 1253 (7th Cir. 1993).

[53]   *Barrow*, 66 F.3d at 470 (as it appears in Westlaw and Lexis).

But the Dividend Recipients take those comments out of context (particularly the latter, where they fail satisfactorily to address the sentence that was added to follow the quoted passage), and extend them beyond their context. The Circuit's basis for finding the absence of a mistake in *Barrow* cannot be understood without review of the facts—and in particular, the chronology—of that case, and of the *Barrow* court's amendments to the earlier version of its decision as set forth in its subsequent order.

Looking to the *Barrow* facts, it is hardly surprising that the Circuit found no mistake there. *Barrow* did not involve a mistake by any standard under which "mistake" could be defined. In *Barrow*, the inmate sued none of "Whethersfield [sic.] Police Officer's [sic.]," or "John Doe" defendants thinking they were the actual police officers who allegedly had beaten him; he named them solely as placeholders. As significantly or more so, the inmate *was told*—by the district judge, no less—that he had to name the actual police officers who allegedly had beaten him, and he knowingly failed timely to do so. The inmate *knew* that he had not named the actual police officers when he named "John Doe" defendants, and *knew* that the district judge had told him that naming the actual police officers was required.[54]

The *Barrow* court's holding—and, as importantly, what it was not holding—may also be understood by a comparison between its original decision and its decision as revised.[55] In three separate places, the *Barrow* court amended its original decision to add text or change its earlier formulation to make clear why it held as it did—because when the inmate had knowingly sued placeholder defendants, and failed to name the actual wrongdoers after being told that he would have to do so by the district court, he could not

---

[54]    *Id.* at 469.

[55]    *See* n.3, *supra.*

claim mistake.  Thus, in the first of its three changes, the *Barrow* court amended the

earlier version of its decision to add:

> Here we are not faced with a plaintiff who
> mistakenly believed that suing the police
> department, rather than a department head, would
> suffice.  *Instead, Barrow was informed by the
> court—within the limitations period as Barrow
> construes it—that he needed to name the individual
> officers as defendants.  Therefore, Barrow was not
> "mistaken" for purposes of rule 15(c)—he knew
> exactly what the court required.*  Barrow's
> subsequent failure to identify the individual officers
> is a separate matter to which Rule 15(c) does not
> speak.[56]

Then, in the second of its three changes, the *Barrow* court revised its earlier

decision to explain more fully the basis for its reliance on *Worthington*, the Seventh

Circuit case.  The *Barrow* court modified its reference to the Seventh Circuit holding to

add the significant words:

> in a case where a plaintiff sought to amend a
> complaint against *"unknown police officers"*….[57]

Finally, in the third of its three changes, the *Barrow* court revised its earlier

decision to *delete the words*:

> but the lack of knowledge of a party's identity
> cannot be characterized as a mistake.

In place of that, the *Barrow* court substituted:

---

[56]    74 F.3d at 1367, first change (emphasis added).  To complete the analogy, here the Estate
Representative named EquiServe not as a placeholder, but in the erroneous belief that it was the
proper defendant.  This Court is not of a mind to conclude that the Estate Representative thought
that naming EquiServe would "suffice," *see id.*—because that might suggest a tactical decision
that the Estate Representative, from all present indications, did not make—but notes the important
contrast between this case and *Barrow*:  that when it named EquiServe, the Estate Representative
had no knowledge that the defendant it had sued was either a placeholder or the wrong defendant.

[57]    74 F.3d at 1367, second change (emphasis added).

> but the failure to identify individual defendants
> *when the plaintiff knows that such defendants must
> be named* cannot be characterized as a mistake.[58]

That last change, in particular, is highly significant.  The *Barrow* court expressly deleted a statement articulating the broader rule on which the Dividend Recipients rely—substituting a much narrower basis for its holding in that case.  The *Barrow* court replaced the earlier, broader, language with its true holding:  that "the failure to identify individual defendants *when the plaintiff knows that such defendants must be named* cannot be characterized as a mistake."

The Dividend Recipients acknowledge the changes, but pass them off as inconsequential, speculating that the change might have resulted from a motion for reargument.[59]  But this Court's review of the *Barrow* docket in the Second Circuit reveals no indication of any such motion, and it appears, rather, that the *Barrow* panel amended its opinion on its own motion.  The Dividend Recipients point out, appropriately, that when language "but the lack of knowledge of a party's identity cannot be characterized as a mistake" was deleted in the amended *Barrow* decision, the *Barrow* court failed to delete similar language in the two other places where it appeared.[60]  But as noted above, the remarks in the other two places were in a particular context—in which comments of that character, when read with the sentences just preceding or following them, were understandable.  In this Court's experience, the Circuit does not modify decisions after they have been issued very often, and this Court can only conclude that the changes were for a reason.  They point to a narrowing of the Circuit's holding, with an emphasis on the

---

[58]    74 F.3d at 1367, third change (emphasis added).

[59]    *See* Tr. Of Hrg. on April 17, 2006 at 17.

[60]    *Id.* at 20.

fact that because the inmate *knew* that the "defendants must be named, there can be no mistake."

And it is particularly clear that *Barrow* does not provide a basis for abandonment of textual analysis, as the *Barrow* holding, especially after its amendment, is, on the facts the Circuit took pains to emphasize, fully consistent with textual analysis doctrine.

Finally, the Dividend Recipients noted in their reply and in oral argument, without contending that it is binding,[61] an unreported "summary order" decision of the Second Circuit, *Vital v. New York*.[62] The Court agrees that *Vital*, like *Barrow*, has language in it tending to support them. But *Vital* is not binding on this Court, and is too thin in its discussion and too remote in its factual similarity to be persuasive here.

*Vital*, like *Barrow*, involved a suit against police officers by plaintiffs for alleged misconduct in connection with an arrest. In the first of the two rulings in the summary order, the Circuit affirmed the dismissal, on summary judgment, of the two police officers who had been timely named, after they submitted proof that they had not been involved—and that it was the police officers' superior, a Lieutenant not named in the complaint, who had been involved in the plaintiffs' arrest and interrogation. In the second ruling in the summary order, and more to the point here, the *Vital* court also affirmed the lower court's denial of leave to amend to name the Lieutenant by reason of a failure to satisfy the relation back requirements of Rule 15(c).

---

[61]     *See* Dividend Recipients' Reply Br. at 7 n.6 ("[T]he Representative Defendants do not cite *Vital* as binding precedent, but simply call it to this Court's attention as helpful in interpreting *Barrow*, which is of course binding precedent.").

[62]     126 Fed. Appx. 393, 2005 U.S. App. LEXIS 11933, 2005 WL 1427500 (2d Cir. June 17, 2005) (Summary Order).

The latter ruling in *Vital* was apparently based on alternate grounds. It was made in the context of a *Vital* court observation that "it is not clear that plaintiffs specifically alleged that they made a mistake of law or a mistake of fact in naming the [innocent police officers] rather than [the Lieutenant]." And it appears that the *Vital* court was skeptical of the plaintiffs' claim that "they were not aware of [the Lieutenant's] identity at the time the original cause of action commenced."[63] The *Vital* court noted, in this connection, that

> [P]laintiffs' attorney averred that "[the Lieutenant] was so instrumental in contributing to Plaintiff's injuries that he was the only officer [plaintiffs] encountered on October 16, 2003, whose name they remembered." If plaintiffs specifically knew [the Lieutenant's] name, their failure to name him in their complaint plainly cannot be construed as a "mistake concerning [the Lieutenant's] identity."[64]

But the *Vital* court also cited the broad language from *Barrow* upon which the Dividend Recipients rely, stating that "[a]ssuming *arguendo*" that the *Vital* plaintiff's were ignorant of the Lieutenant's name, the result would be no different.[65] To the extent this was holding, that would indeed suggest an application of *Barrow* beyond its particular facts.

But as the Dividend Recipients acknowledge, summary orders of the Second Circuit are not binding. The Circuit has expressly stated that summary orders do not have precedential effect.[66] And citation of summary orders is limited to those summary orders filed after January 1, 2007;[67] this summary order was entered before that time. The

---

[63]    *See id.* at 395.

[64]    *Id.* at 396 n.1.

[65]    *See id.* at 395-396.

[66]    *See* 2d Cir. Local Rule 32.1(b) ("Rulings by summary order do not have precedential effect.").

[67]    *See id.* at 32.1(c)(1).

Circuit has ordered that citation of summary orders filed prior to that date is not permitted

in the Second Circuit or any other court, except in a subsequent stage of a case in which

the summary order has been entered, in a related case, or in any case for purposes of

estoppel or *res judicata*.[68]  In its Comment to Local Rule 32.1, the Circuit observed, in

relevant part:

> Summary orders are issued in cases in which a
> precedential opinion would serve no jurisprudential
> purpose because the result is dictated by pre-
> existing precedent.  Such orders are prepared
> chiefly for the guidance and information of  counsel
> and parties, and the district court (or other
> adjudicator) that issued the ruling from which the
> appeal is taken, all of whom are familiar with the
> facts, procedural history and issues presented for
> review.  Summary orders are therefore often
> abbreviated, and *may omit material required to
> convey a complete, accurate understanding of the
> disposition and/or the principles of law upon which
> it rests.*  Like the great majority of the circuits, the
> court has chosen to make summary orders non-
> precedential.  Denying summary orders precedential
> effect does not mean that the court considers itself
> free to rule differently in similar cases.  *Non-
> precedential summary orders are used to avoid the
> risk that abbreviated explanations in summary
> orders might result in distortions of case law.*[69]

Reliance by this Court on the abbreviated explanations in *Vital* would be subject to

exactly that risk.

The Dividend Recipients cite Judge Haight's decision in *Feinberg v. Katz*,[70] for

the proposition that it is appropriate to consider an unpublished decision of the Second

---

[68]     *Id.* at 32.1(c)(2).

[69]     *Id.*, "Comment" (emphasis added).

[70]     2002 WL 1751135, at *12 n.7 (S.D.N.Y. July 26, 2002).

Circuit if that unpublished opinion … "expressly disapproves" of a party's argument.[71]

The Court assumes that to be true, even though what Judge Haight actually said was "I believe that it is appropriate for me to consider *Pavlov* because the case expressly disapproves of the main case cited by the defendants."[72]  But the *Vital* court (like *Barrow*, for that matter) did not reject or disapprove the use of textual analysis in the interpretation of Rule 15(c), nor did it disapprove the cases, discussed below, upon which the Estate Representative relies.  The extent, if any, to which the Circuit would apply *Barrow's* broad language (*dictum* when applied to wholly different facts) to a case like this one, not involving "John Doe" defendants or other defendants that the plaintiff chose not to sue or *knew* were improper defendants, and notwithstanding Rule 15(c)'s unambiguous text, is one as to which this and any other lower court would welcome the Circuit's views.  But neither *Barrow* nor *Vital* answers that question.

Accordingly, the Court finds nothing in either *Barrow* or *Vital* that would direct this Court not to use textual analysis, or otherwise to conclude that a mistake is not a mistake because it has its origins in inadequate knowledge or ignorance.

*2.  The Conduit Cases*

The Court then turns to the avoidance action conduit cases, upon which the Estate Representative understandably relies.  In the conduit cases, courts have found the Mistake Element to have been satisfied, or capable of being satisfied (subject to further factual development) where an estate representative, instead of suing the voidable transfer ultimate recipient, sued the conduit instead.

---

[71]     Dividend Recipients' Reply Br. at 7 n.6.

[72]     *Feinberg*, 2002 WL 1751135, at *12 n.7.

In the *Color Tile* decisions,[73] the Delaware District Court,[74] and then the Third

Circuit,[75] dealt with facts extraordinarily similar to those here.  In *Color Tile*, an

unsecured creditors' committee (the "Creditors' Committee") filed an adversary

proceeding to recover, as constructively fraudulent transfers, dividends paid by a

corporate debtor to holders of its preferred stock.  The Creditors' Committee timely sued

a conduit, the Depository Trust Company ("DTC," which used a nominee, Cede & Co,

"Cede"), to whom the dividends had initially been paid.  But, as here, the Creditors'

Committee did not identify the ultimate recipients of the dividends until after the statute

of limitations had run.  After the ultimate dividend recipients were named as additional

defendants in an amended complaint, they moved for summary judgment, asserting that

the claims that had been asserted against them did not relate back to the original

complaint under Rule 15(c)(3), and hence were timed barred.

In *Color Tile-District*, the district court granted summary judgment in favor of the

defendants, ruling that the Creditors' Committee had failed to show compliance with

Rule 15(c)(3)'s Timely Notice Requirement.  But significantly for the purposes of this

case, the *Color Tile-District* court did so only after finding that the Mistake Element of

Rule 15(c)(3) *had* been satisfied.  (Then in *Color Tile-Circuit*, the Third Circuit, without

finding fault with *Color Tile-District's* mistake analysis, reversed on the Timely Notice

Requirement issue, finding issues of fact in that regard.)

Relevant here is the determination in *Color Tile-District* that Rule 15(c)(3)'s

Mistake Element was satisfied.  Though with the benefit of Third Circuit law (which

---

[73]         *See* n.2, *supra*.

[74]         *See* 278 B.R. 366, 373-374 (D. Del. 2002).

[75]         *See* 92 Fed. Appx. 846, 2004 WL 287149 (3d Cir. Feb. 11, 2004) (Not Precedential).

historically has relied on textual analysis of Rule 15(c)(3) to a greater degree than the

Second Circuit has), the *Color Tile-District* court easily held that naming the conduit

Cede as the original defendant, instead of the ultimate dividend recipients, was a classic

mistake.  It held:

> In the case at bar, plaintiff mistakenly named Cede
> in its original complaint because it did not know
> that the SSR defendants, rather than Cede, were the
> beneficial owners of certain shares of Color Tile
> stock.… While this is not identical to a case where
> "John Doe" in the caption is clearly a placeholder
> for an unknown defendant (here, plaintiff named
> Cede specifically), the important point is that
> plaintiff lacked information about the true identity
> of the beneficial owners of the stock at the time it
> filed the original complaint, through no fault of its
> own.…
>
> The court concludes, therefore, that plaintiff's lack
> of knowledge is a cognizable mistake under Rule
> 15(c)(3)(B).[76]

Also closely on point is Chief Judge Bernstein's decision in this district, in

*Randall's Island*.[77]  In that case, the estate filed an action to avoid and recover insurance

premiums that had been paid to Mang Craine and Mirabito Insurance Agency, an

insurance broker, and its affiliate, Granite Capital Holdings—together referred to there

and here as "Mang."

---

[76]  *Color Tile-District*, 278 B.R. at 373-374.  In *Color Tile-District*, where the conduit that the
Creditors' Committee had named was a nominee (and arguably an agent) for the dividend
recipients, the court found the mistake "understandable," and through "no fault of its own."  Here,
of course, the Estate Representative sued Global Crossing's own agent for dividend
distributions—an error that is far less understandable.  Nevertheless, in each case the mistake
arose from the plaintiff's ignorance as to whom to sue, and as *Leonard*, *Randall's Island* and
*Moore's Federal Practice* make clear, whether there is a legally cognizable "mistake" ultimately
does not turn on how "understandable" or egregious the mistake is.

[77]  *See* n.2, *supra*.

At the time they filed the original complaint, the *Randall's Island* debtors believed that Mang was the appropriate transferee to sue. But after the statute of limitations expired, they were advised that Mang was just a conduit, and that Mang had transferred the payment to the ultimate recipient, Crum & Forster (referred to there and here as "Crum"). The *Randall's Island* debtors moved to amend their complaint to add Crum as a defendant, but Crum opposed the motion, contending that amendment would be futile because the statute of limitations had run. Crum argued that Rule 15(c) could not be utilized, asserting the estate had not made a "mistake" in naming Mang as the sole defendant in the original complaint.

Judge Bernstein rejected that contention, and permitted amendment, finding the requisite "mistake." He ruled, after careful review of Rule 15(c), that "mistake" under Rule 15(c)(3) was not limited to cases of misnomer or to a specific type of misidentification, nor was it restricted to good faith, honest mistakes. It also covered mistakes like naming the conduit instead of the ultimate recipient, even if resulting from negligence or carelessness.[78]

Judge Bernstein noted in *Randall's Island*, in analysis equally applicable here, that a mistake under Rule 15(c)(3) existed where the plaintiff was required and intended to sue the actual participant in the event, but misidentified or misnamed him in the original pleading.[79] And in analysis which would apply equally well here if one simply substituted "Dividend Recipients" for "Crum," he held that "[h]ere, the debtors failed to

---

[78]    *Randall's Island*, 2002 WL 31496229, at *3.

[79]    *Id.* at *4.

name Crum as a result of a mistake in identifying the transferee of the payments, and not

because of a strategic decision."[80]

In analysis equally applicable here, Judge Bernstein noted that the *Randall's*

*Island* debtors sued Mang because Mang received the payments, and appeared to be the

initial transferee.[81]  The *Randall's Island* debtors did not learn that Crum might be the

initial transferee until Mang and Granite alleged in their answers that they were acting as

"mere conduits" for Crum.[82]

Near the end of his opinion, Judge Bernstein summarized why he was finding a

mistake:

> In the end, there is no basis to conclude that the
> debtors knew that Crum was the initial transferee
> but nonetheless decided to sue Mang.  Rather, they
> intended to sue the initial transferee, who they
> mistakenly believed to be Mang, and added Crum
> when they discovered the misidentification.
> Accordingly, the claim against Crum relates back to
> the date of the original complaint ….[83]

---

[80]    *Id.*

[81]    "Initial transferee," the expression used in section 550 of the Code, is generally the first entity
from whom recovery is available.  But it excludes mere conduits.  5 COLLIER ON BANKRUPTCY
550.02[4][a], at 550-18 (15th ed. rev. 2007).  As Collier explains:

> Generally, the party who receives a transfer of property
> directly from the debtor is the initial transferee.  However,
> many courts have found that a party acting merely as a conduit
> who facilitates the transfer from the debtor to a third party is
> not a "transferee" and, therefore, not the initial transferee.
> Rather, these courts have held that the minimum requirement
> of status as a "transferee" is dominion over money or other
> assets, or the right to use the money or assets for one's own
> purposes.

*Id.*

[82]    *Randall's Island*, 2002 WL 31496229, at *4.

[83]    *Id.* at *5.

That analysis is exactly applicable here.[84]

Also instructive are the opinions in still another conduit case, *Greater Southeast*.[85] There Judge Teel considered Rule 15(c) issues in connection with an avoidance suit by the trustee for a chapter 11 liquidating trust—where, in the now-familiar pattern, the trustee sued the conduit (there, as in *Randall's Island*, an insurance broker), and then learned that the conduit had passed at least most of the funds it had received on to added defendants the trustee sued only after the statute of limitations ran. Judge Teel denied the added defendants' motions to dismiss—clarifying his initial decision, upon a motion for reconsideration, to note that it was without prejudice to renewal on summary judgment if it should turn out that the trustee did in fact have knowledge of the identities of the defendants later sued, and did not in fact make a mistake.[86] He rejected the absolutist view argued by the Dividend Recipients here:

> A rule that would categorically exclude mistakes of this nature from the definition of Rule 15(c)(3)— mistakes that have no underlying strategic explanation, typically involve information peculiarly within the control of the existing

---

[84] Though Judge Bernstein was aware of, and addressed, the Second Circuit decisions in *Cornwell* and *Barrow*, each of which had been decided as of the time of his ruling, neither caused him to rule differently. *Cornwell* was emblematic of those cases where a plaintiff chose not to name a particular defendant as part of a deliberate strategy; the plaintiff knew the identities of the persons who had harassed her, but she was not required to sue them and did not name them initially. In *Barrow*, Judge Bernstein noted, "[the] district court had warned the plaintiff within the limitations period that he needed to name the individual defendants." *Id.* at *3 n.5.

[85] *See* n.2, *supra*.

[86] He noted in his supplemental opinion, however, that:

> The court adheres to its prior analysis regarding what does and does not constitute a mistake for purposes of Rule 15(c)(3), and it likewise stands by its determination that if [the plaintiff-trustee] Alberts did not have adequate notice that a conduit relationship might exist between AJG and the Added Defendants until AJG raised the mere conduit defense in its answer, relation-back applies.

*Greater Southeast*, 2006 WL 2083500, at *3.

> defendant (the initial recipient of the transfer) and
> the defendants sought to be added, and whose
> significance cannot be fully appreciated until the
> bankruptcy court rules on questions of fact and
> law—would be too narrow.[87]

Judge Teel discussed *Randall's Island*, discussed above, at considerable length,

expressing his agreement with Judge Bernstein's approach in that case.[88]  And he rejected

the argument that there could be no mistake when suing the conduit, rather than the

ultimate transferees, resulted from lack of knowledge.  He ruled quite the opposite:

> Here, to the extent that AGC [the defendant
> originally named] was a mere conduit, the Added
> Defendants who received the transfers were the
> initial transferees and hence the only appropriate
> defendants to sue, but [the trustee-plaintiff] Alberts'
> lack of knowledge led to his mistake in not suing
> them, thus making Rule 15(c)(3)(B) applicable.[89]

Judge Teel also considered *Barrow*, and the statements in *Barrow*, upon which the

Dividend Recipients here rely, that there could be no mistake when a plaintiff fails to

originally name a defendant because he lacks knowledge of that defendant's identity.  He

observed:

> At first glance, such a proposition would appear to
> bar relation-back in a situation such as this where
> the plaintiff concedes that his failure to name the
> additional defendants resulted entirely from his lack
> of knowledge.  Yet in *Barrow*, … the lack of
> knowledge at issue concerned the plaintiff's lack of
> knowledge as to the specific identity of the ten
> officer defendants more generally identified in the
> complaint with the placeholder "John Doe."  As is
> standard in John Doe cases, the plaintiff understood
> the need to ascertain the perpetrators' identities and
> he simply lost the race against time by failing to do

---

[87]    *Greater Southeast*, 341 B.R. at 100.

[88]    *See id.* at 101.

[89]    *Id.*

> so before the statute of limitations expired.… The lack of knowledge alleged by the trustee in this case is more fundamental in nature, and goes to the very existence of additional parties coming within the orbit of this § 550 action.  Without any knowledge concerning post-transfer transactions between [the initially named conduit] AJG and third parties, [the trustee] Alberts had no basis upon which to believe any party other than AJG was the initial transferee.[90]

The Estate Representative's lack of knowledge here is of the same character.

Finally, the Court considers the Rule 15(c) decisions decided in avoidance action conduit case adversary proceedings under the umbrella of the *Enron* chapter 11 cases. The cases had different outcomes, arising from the fact-driven inquiry in which Judge Gonzalez engaged in those cases.  But they shared the common characteristic of rejection of the notion urged by the Dividend Recipients here that in all cases, a lack of knowledge of the identity of the proper defendant prohibits a finding of "mistake" under Rule 15(c). In *Enron-Merrill Lynch*, for example, Judge Gonzalez considered avoidance actions involving the early redemptions of Enron commercial paper.[91]  It turned out that the entity Enron timely sued—Merrill Lynch Investment Management ("MLIM")—was only a conduit, requiring Enron to amend its complaint to seek out the ultimate transferees and/or beneficiaries of the commercial paper redemptions, including an MLIM affiliate, Merrill Lynch Investment Management Japan ("MLIM Japan"), and Enron sought permission to do so, with relation back under Rule 15(c)(3).

MLIM and MLIM Japan objected, arguing that Enron did not satisfy the requirements of Rule 15(c)(3).  Citing *Barrow*, they made the same arguments the Court

---

[90]       *Id.* at 103 n.14.

[91]       *See Enron-Merrill Lynch*, 361 B.R. at 38.

has heard here—that Enron's failure to include MLIM Japan was not a "mistake" under

Rule 15(c)(3) because the rule would not allow an amendment to a complaint adding

parties where the newly added defendants were not named originally due to a lack of

knowledge or because the plaintiff did not know their identities.[92]  Judge Gonzalez

rejected those arguments, finding *Barrow* distinguishable for the same reasons this Court

has, above—that the plaintiff in *Barrow knew* that unnamed individual defendants had to

be named[93]—and Judge Gonzalez disagreed with their argument that *Randall's Island*

was distinguishable.[94]  Judge Gonzalez likewise discussed at length, and repeatedly

expressed his agreement with, Judge Teel's holdings in *Greater Southeast*,[95] finding

*Greater Southeast* "additionally instructive" in its mistake analysis.  Judge Gonzalez

endorsed, and even quoted, the holding in *Greater Southeast* that "[the Litigation

Trustee's] lack of knowledge led to his mistake in not suing [the added defendants], thus

making Rule 15(c)(3)(b) applicable."[96]

Several other *Enron* cases, which are unreported, had different bottom line results

based on their facts.  But none was inconsistent in its legal analysis with the reported

*Enron* decisions, discussed above.[97]

---

[92]    *Id.* at 40.

[93]    *Id.* at 44.

[94]    *Id.* at 44, 45-46; *see also Enron-Earthlink*, 357 B.R. at 266 (likewise rejecting the contention that *Randall's Island* was distinguishable).

[95]    *Greater Southeast*, 341 B.R. at 46-47, 50-51.

[96]    *Id.* at 50.

[97]    The Court is aware that several district courts in the Second Circuit—though most commonly in prisoner beating § 1983 cases and none in bankruptcy or conduit cases—have cited *Barrow* and/or applied the broad language in *Barrow* upon which the Dividend Recipients rely.  *See Clark v. Dowty*, 2007 WL 2022045 (D. Conn. July 9, 2007) (prisoner beating § 1983 case); *Sidney v. Wilson*, 228 F.R.D. 517 (S.D.N.Y. 2005) (prisoner beating § 1983 case); *Shell v. Brzezniak*, 365 F. Supp. 2d 362 (W.D.N.Y. 2005) (prisoner beating § 1983 case); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2005 WL 1679540 (S.D.N.Y. July 18, 2005) (securities fraud aiding and

III.

Timely Notice/Lack of Prejudice Requirement

The Court then turns to the other, and more important, of Rule 15(c)(3)'s two

requirements—the requirement of timely notice and lack of prejudice—and, as

significant here, the extent to which the Rule 4(m) orders—and particularly the first of

them—extended the statute of limitations for Dividend Recipients who had neither been

named as defendants nor identified when the Rule 4(m) extensions were sought and

obtained.[98]

---

abetting case); *Olumuyiwa v. Harvard Prot. Servs., Inc.*, 2000 WL 620202 (E.D.N.Y. May 12, 2000) (employment discrimination case).

But none of these cases had any need to focus on matters addressed in this decision, and none of them did, because, *inter alia*, they merely involved instances in which no mistake could be found because the plaintiff (1) did not sue a wrong party in place of the right one(s), but rather failed to discover *additional* parties; (2) failed to sue one or more defendants of which the plaintiff *was already aware*; or (3) *knew* when he originally sued that he did not know the names of defendants who were later added.  *See Shell*, 365 F. Supp. 2d at 367-368 (plaintiff in § 1983 prisoner beating case had previously named some officers whom he charged with the beating, but sought to add others); *Clark*, 2007 WL 2022045, at *2-*3 (same, except that the plaintiff in the § 1983 beating case sought to add only one other); *Adelphia*, 2005 WL 1679540, at *8 (plaintiffs had sued some participants in Adelphia fraud, but sought to sue *other* participants, not in place of original ones but *in addition* to them); *Olumuyiwa*, 2000 WL 620202, at *4 (plaintiff sued one entity that he claimed wronged him, but failed to sue *additional* defendants of whom he had some, but lesser, knowledge); *Sidney*, 228 F.R.D. at 520-521 (plaintiff in § 1983 prisoner beating case had previously named one officer whom he charged with the beating, but sought to add others, whom he had previously identified as "Gallery Officer" and "Area Supervisor"—thereby demonstrating the lack of mistake).

Thus those cases are easily distinguishable upon their facts, as none involved a suit against a conduit or other entity that was mistakenly sued in place of one or more ultimate recipients.  More fundamentally, however, the Court notes that none rejected (or even had occasion to consider) textual analysis; none addressed facts of the character of those present here; and none had the need to, or did, address the issues with the depth of analysis of the decisions in *Randall's Island*, *Color Tile*, *Greater Southeast* and the *Enron* cases.  Their brief citation to *Barrow* was sufficient to meet the needs of those fundamentally different cases; it is insufficient to address the issues here.

[98]    While, as noted above, this requirement has two elements, the Court need not, and does not, now consider the element of lack of prejudice.  The record for that has not been satisfactorily developed on the present motions, and it is more appropriately considered for any defendants who otherwise got timely notice.

-45-

Rule 4(m), as applicable when the Dividend Recipients' dismissal motions were filed,[99] provided, in relevant part:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.[100]

The Court concludes that the first Rule 4(m) order, while appropriately entered for the purposes for which it was sought, had neither the purpose nor effect of extending the statute of limitations for claims against then-unnamed and unidentified Dividend Recipients. Thus, the Court rules that claims against individual Dividend Recipients will relate back to the filing of the suit against EquiServe, and hence be timely, to the extent, but only the extent, that any such Dividend Recipient received the requisite notice within the Rule 15(c) period without extension—*i.e.*, within 120 days of the time the Estate Representative filed this action.

In the federal courts, in suits, like this one, based on federal statutes, an action is deemed commenced against a defendant (thus stopping the clock under the statute of limitations)[101] when the action is filed,[102] as contrasted to the time the defendant is served

---

[99]    *See* n.19, *supra*.

[100]    FED. R. CIV. P. 4(m).

[101]    *See Henderson v. United States*, 517 U.S. 654, 657 n.2 (1996) ("In a suit on a right created by federal law, filing a complaint suffices to satisfy the statute of limitations.").

[102]    *See* FED. R. CIV. P. 3 ("A civil action is commenced by filing a complaint with the court."). As Siegel observes, in actions other than those based on diversity of citizenship:

> Rule 3 provides the rule of federal practice that the filing of the complaint marks the commencement of the action. The moment of filing is the key time to look to determine whether the statute of limitations has been satisfied. As long as the

-46-

with process—the rule applicable in many states.[103]  But to secure the benefits of that

regime, the plaintiff must serve the defendant within the time provided by Rule 4, which

is 120 days unless extended by an order of the Court.  If the plaintiff fails to serve a

defendant within that time, such defendant may secure the action's dismissal.  While any

such dismissal would be without prejudice to the filing of a new suit, the new suit would

not get the benefits of the earlier date of filing.  At least as a general matter, a Rule 4(m)

order has neither the purpose nor effect of extending the statute of limitations—which, in

the federal courts, must be satisfied by the timely filing of a complaint.  Instead, Rule

4(m) permits an extension of the time to serve process to secure the benefits (and avoid

the dismissal) of the previously filed complaint.

Both sides recognize that under Rule 4(m), the 120-day period can be extended by

an order of the Court for good cause, and, in some circumstances, can be extended upon a

lesser showing.  The cause for securing a Rule 4(m) order has historically been

difficulties in serving a named defendant with process—including such things as

difficulties in finding the defendant, or a defendant's ducking service.[104]  It was such

---

> complaint has been filed on or before the last day … the action
> is timely and the summons and complaint can be served at any
> time during the 120 days that follow.

David D. Siegel, Practice Commentary for FED. R. CIV. P. 3, in 28 U.S.C.A. Rule 3.

[103]  *See* 4B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3d § 1137 (2002) ("*Wright & Miller*") ("In many states the service of the summons and complaint, and not the filing of the complaint with the court, tolls the limitations period.").

[104]  *See id.*  As noted in *Wright & Miller*:

> [G]ood cause is likely (but not always) to be found when the
> plaintiff's failure to complete service in timely fashion is a
> result of the conduct of a third person, typically the process
> server, the defendant has evaded service of the process or
> engaged in misleading conduct, the plaintiff has acted
> diligently in trying to effect service or there are
> understandable mitigating circumstances, or the plaintiff is
> proceeding pro se or in forma pauperis.

-47-

things that were among the stated bases for securing the first Rule 4(m) extension here,

and the bases upon which the first Rule 4(m) extension was granted.

At the time the Dividend Recipients first appeared in this action and sought to be

heard on the entry of further Rule 4(m) orders, they pointed out that the Estate

Representative had cited no case in which a Rule 4(m) order was entered for the purpose

of discovering new defendants, as contrasted to serving defendants previously named.[105]

The text of Rule 4(m) does not, by its terms, limit the bases upon which the Court can

find cause for a Rule 4(m) extension, but neither does it authorize extensions for the

purpose of discovering new defendants.  Rule 4(m) is conspicuously silent as to any

references to defendants or prospective defendants who have not yet been identified.  The

tenor and context of Rule 4(m) is rather the extension of the time limit for service of

those who have previously been named as defendants (or at least identified), but who

need to be served.  If Rule 4(m) had the purpose or effect of extending statutes of

limitations for unidentified prospective defendants, its effectiveness for that purpose

would at best be debatable under the Rules Enabling Act.[106]

Put another way, Rule 4(m) relief has historically been pegged to *service of

process* needs, rather than defendant identification needs.  The Estate Representative has

presented the Court with no case in which a Rule 4(m) extension was granted to uncover

new, previously unidentified, defendants.  After the argument on this motion, *Greater

Southeast* came down.  But in *Greater Southeast*, an answer revealing the conduit

problem was filed before the 120 days ran out (long before the Rule 4(m) extension was

---

      *Id.*

[105]   Tr. of Hrg. of October 19, 2005 at 5-6.

[106]   *See* 28 U.S.C. § 2072(b) (the rules of procedure "shall not abridge, enlarge or modify any
substantive right").

sought), and an amended complaint naming the newly added defendants was likewise

filed within that same 120 days—and only five days (three business days) after the filing

of the motion for a Rule 4(m) extension.[107]  The inference is very strong that the newly

added defendants already had been identified when the Rule 4(m) motion was made, and

there is no indication in *Greater Southeast* to the contrary—or that the purpose of the

Rule 4(m) order there was to stretch out the statute of limitations to permit the discovery

of new defendants who might later be unearthed.[108]

The Dividend Recipients argue that "[c]ourts do not use Rule 4(m) extensions in

the manner urged here—to provide a means for granting open-ended extensions of the

statute of limitations to permit the plaintiff to identify and name new defendants."[109]  If

limited to say "as a general matter," they are correct.  If the Court were presented with

Rule 4(m) extension requests based on facts similar to those in *Greater Southeast*

(requesting an extension of time to amend the complaint and then serve already *identified*

---

[107]   *See Greater Southeast*, 341 B.R. at 95.

[108]   At oral argument, in response to a question by the Court with respect to the practical problems estate representatives face and what they might do to confront them, counsel for Dividend Recipients described the kinds of things he might do to avoid a mistake of the type the Estate Representative made here—while also stating that neither the question nor the answer would be legally relevant on the mistake test.  *See* Tr. of Hrg. of April 17, 2006 at 12-14.  He was right in that latter regard—though for reasons different than those underlying his response.  As *Leonard* makes clear, Rule 15(c) determinations do not turn on the skill or diligence of the plaintiff, or the extent to which the mistake was avoidable.

But the points he made are instructive to the bankruptcy community as to how to avoid the problems resulting from the need to bring avoidance actions against possibly unknown ultimate recipients and the limited purpose and effect of Rule 4(m).  Debtors and/or estate representatives should engage in the necessary investigation of the identity of transferees on major avoidance actions before the statute of limitations runs, either by Rule 2004 examinations or by bringing suit against the apparent transferees early enough to permit the estate to learn in discovery before the statute of limitations runs whether any such transferees were mere conduits.  Then the estates would have time to name the ultimate beneficiaries of avoidable transfers, or, if need be (*e.g.*, in cases of obstruction or delay), to invoke principles articulated in cases like *Greater Southeast* and *Byrd v. Abate*.

[109]   Dividend Recipients' Reply Br. on Motion for Fifth Order for Rule 4(m) Relief, dated October 4, 2005, at 4.

defendants), or *Byrd v. Abate* (where, before the statute of limitations ran, defendants could not be identified by reason of others' obstruction or delay), the Court would be inclined to rule consistent with those cases. But as one of the counsel for the Dividend Recipients fairly observed, the bases for the first Rule 4(m) extension here were quite different. As noted above, the stated reasons for the first 4(m) extension were the task of amassing the addresses of approximately 1,000 defendants; missing addresses; information difficulties occasioned by the earlier sale of Global Crossing to third-party buyers; books and records that could not be found; burdens on the Clerk of the Bankruptcy Court in this district (dealing with nearly 5,000 other adversary proceedings in *Enron*, *Ames Department Stores* and *Bethlehem Steel*); delay of returned mail; and the judicial economies that would result in avoiding the need to require 1,000 separate motions for extensions of time. Significantly absent from the first 4(m) motion, or resulting order, was any mention of a need, or purpose, to enable the Estate Representative to discover new defendants. That only came later, in the second, third and fourth requests.

As counsel for one of the Dividend Recipients pointed out,[110] the first extension motion sought a Rule 4(m) extension for a very specific purpose—to complete service on approximately 455 complaints that could not yet be effected. It "morphed" into an undertaking for a quite different purpose, to address EquiServe's conduit defense and to "identify, locate and then serve all new defendants."[111] And significantly, as that counsel also pointed out, when the first extension request was sought and obtained, EquiServe, the only defendant in this action, had *already* been served, making Rule 4(m) relief

---

[110]    *See* Tr. of Hrg. of October 19, 2005 at 5.

[111]    *Id.* at 6.

wholly unnecessary—or at least unnecessary with respect to any reason that had been articulated as providing cause.[112]

The Court can construe its own orders, with the benefit of its knowledge of its intent in ordering as it did.[113] Doing so, the Court rules, perhaps not surprisingly, that the purpose and effect of the first Rule 4(m) order was to address the needs that had been articulated in the first Rule 4(m) motion, all of which were variants of a common theme—difficulties in effecting service. The Court did not then have occasion to consider, and did not consider, the extent, if any, to which Rule 4(m) could be used to address different needs, such as the ones now before the Court.[114] Addressing such different needs was not the purpose of the first Rule 4(m) order. Nor should (or does) the Court rule that it nevertheless had that effect.

The Court does not need to decide, and does not decide, what it would do if faced on the first Rule 4(m) request with facts like those later presented to it in the second, third, and fourth requests. The first request here articulated very different reasons for the Rule 4(m) extension, and was granted with the purpose and intent of responding to the

---

[112]    The issue is not, as the Estate Representative articulated it, *see* Estate Rep. Reply Br. dated October 17, 2005 at 14, whether service of process on one defendant bars an extension of the service period with respect to other defendants. Of course service on one defendant does not bar an extension of the time to serve co-defendants who have not likewise been served. The issues here, rather, are whether when the one and only defendant had already been served, any Rule 4(m) relief was necessary or appropriate in this action at all, and whether the Court should find the Rule 4(m) extension applicable to unnamed and unidentified parties for reasons wholly different than the stated reasons for the extension at the time. The Court answers each of these questions in the negative.

[113]    *See, e.g.*, *Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995) ("It is peculiarly within the province of the district court … to determine the meaning of its own order … and the court's interpretation of its order will not be disturbed absent a clear abuse of discretion….") (citations and internal quotation marks omitted).

[114]    *See id.* (declining to overturn district court's ruling that litigant's right to pension benefits "simply was not decided" when issue "had not been raised or argued, and the court did not mean to decide it").

Estate Representative's then-stated concerns.[115]  The Court is unwilling to construe its

order to cover a purpose that was not intended at the time it was entered.  Such a

construction, at least under the facts here (where there was no obstruction or delay before

the order was entered), would result in the risk, if not also the certainty, of making the

statute of limitations a nullity.[116]

　　　As noted above, Rule 15(c)(3) relief requires that the new party receive adequate

notice of the plaintiff's claims within the time limits specified in Fed.R.Civ.P. 4(m).  As

the first Rule 4(m) extension was ineffective to extend the time to provide such notice

---

[115]　　The first Rule 4(m) order stated, expressly, that "any party to an Adversary Proceeding may, for good cause shown and where circumstances warrant, seek a modification of the terms contained in the prior decretal paragraph with respect to that particular Adversary Proceeding …."  Order dated May 18, 2004 (ECF # 4302 in Case No. 02-40188) at 2.  The orders that followed it before Dividend Recipients appeared were to the same effect.  The purpose and effect of each such paragraph was to recognize that the Court did not have the benefit of the usual adversarial system dialogue that typically precedes the entry of the great bulk of federal court orders, and to permit reexamination when the opportunity presented itself.  That provision could, if necessary, provide a basis for the vacatur of the first extension order.  But the Court believes that in light of the stated purpose (*i.e.*, the need to address service of process in hundreds of actions, though ironically, not in this one), entry of the first Rule 4(m) order was entirely appropriate.  It was only when that purpose "morphed" into something else that entry of the first extension order would become a matter of concern.

　　　It is more appropriate, in the Court's view, to hold that the first Rule 4(m) order was fully effective to achieve its stated purpose at the time—extending the time to serve identified, but unserved, entities—but was ineffective to achieve other purposes.

[116]　　*See Locklear v. Bergman & Beving AB*, 224 F.R.D. 377, 380-381 (D. Md. 2004) (ruling that Rule 4(m) orders that had been entered without focusing on or addressing the need to serve defendants yet to be named or identified could not properly be deemed to have extended the period for serving them or applying Rule 15(c) for relation back), *aff'd on other grounds*, 457 F.3d 363 (4th Cir. 2006), *cert. denied*, 127 S. Ct. 1332 (2007).  The *Locklear* court noted in that connection:

> [T]he [Rule 4(m)] orders I entered on April 30, 2003, and September 8, 2003, cannot properly be deemed to have extended the period for service against [newly added] Defendants.  A contrary ruling would be fundamentally unfair, particularly because the limitations period had already expired when I entered my orders and when Plaintiff amended his complaint to add [newly added] Luna and Bergman.  Moreover, such a ruling would raise serious separation of powers concerns because it would enable a court to subvert the legislatively declared policies of finality and repose underlying statutes of limitations solely on the basis of a plaintiff's ex parte submission.

> *Id.*

beyond 120 days from the time this action was filed, subsequent extensions (like the second, third and fourth Rule 4(m) orders) fell with it. They had no extended period to tack on to. Thus claims against a Dividend Recipient will be timely if, but only if, such Dividend Recipient knew or should have known that the claims in this action would have been brought against it within 120 days of the time this action was filed.

Conclusion

The Court determines that here, where the Estate Representative sued the conduit instead of the ultimate Dividend Recipients, the Mistake Element of the Knowledge of Mistake Requirement has been satisfied. The Court is not in a position now to rule on the other element of the Knowledge of Mistake Requirement, or on compliance with the Timely Notice/Lack of Prejudice Requirement, except with respect to the Rule 4(m) issues, discussed above and below. While those issues may be susceptible to disposition on motions for summary judgment, they cannot be determined on a motion to dismiss.

The Court further rules that on the facts here, the first Rule 4(m) extension, while effective to extend the time to serve then identified but unserved entities, was ineffective to extend the time to identify, name and serve entities, like the Dividend Recipients, that were not identified when the Rule 4(m) motion was filed. Thus the Court determines that it will enter no Rule 4(m) extensions beyond those that it already granted, and that, under the reservations of rights in the Court's earlier orders, the Rule 4(m) extensions that were granted after the first are ineffectual to extend the statute of limitations for defendants who were unknown and unnamed when the original 120-day period to serve ran out.

The Dividend Recipients' motions to dismiss are denied, without prejudice to renewal upon summary judgment. After the parties are in a position to provide the Court with a factual record as to the extent to which any Dividend Recipients knew or should

have known, within 120 days of the filing of this action, that they would have been named as defendants on these claims, they may move for summary judgment if they wish.

      SO ORDERED.

Dated: New York, New York          __*s/ Robert E. Gerber*_____
      April _**8**_, 2008             United States Bankruptcy Judge

Appendix A

Comparison of Initial and Revised *Barrow* Decisions

| Original Decision | Modified Decision (Changes italicized; significant changes underlined) |
|---|---|
| *[Italicized text at right absent]* | *In 1966, Rule 15(c) was amended to include the language at issue in this case: an amended complaint relates back if the misidentified party "knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party." Rule 15(c)(3)(B). The Advisory Committee Notes to the amendment state that this subsection cures the problems that arise, for example, when a defendant mistakenly sues an agency of the government without knowing that the cause of action requires the defendant to sue an agency head. An amendment to cure such a mistake, the Notes indicate, should relate back to the original amendment if the requirements of Rule 15(c) are met—in other words, such an amendment arises out of a "mistake" as Rule 15(c) intends that term.*<br><br>*Here we are not faced with a plaintiff who mistakenly believed that suing the police department, rather than a department head, would suffice.* <u>*Instead, Barrow was informed by the court—within the limitations period as Barrow construes it—that he needed to name the individual officers as defendants. Therefore, Barrow was not "mistaken" for purposes of rule 15(c)—he knew exactly what the court required.*</u> *Barrow's subsequent failure to identify the individual officers is a separate matter to which Rule 15(c) does not speak.*[117] |

---

[117]     *See* 74 F.3d at 1366-1367, first change.

| | |
|---|---|
| The Seventh Circuit has thus interpreted Rule 15(c), holding that the rule | The Seventh Circuit, *in a case where a plaintiff sought to amend a complaint against "unknown police officers," has held that Rule 15(c):*[118] |
| Rule 15(c) explicitly allows the relation back of an amendment due to a "mistake" concerning the identity of the parties (under certain circumstances), but the lack of knowledge of a party's identity cannot be characterized as a mistake. | *Rule 15(c) explicitly allows the relation back of an amendment due to a "mistake" concerning the identity of the parties (under certain circumstances), but the failure to identify individual defendants when the plaintiff knows that such defendants must be named cannot be characterized as a mistake.*[119] |

---

[118]        *See* 74 F.3d at 1367, second change.

[119]        *See* 74 F.3d at 1367, third change.